UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12-6-13
```

ROCHE DIAGNOSTICS GMBH, *et al.*,

                Plaintiffs,

-v-

ENZO BIOCHEM, INC., *et al.*,

                Defendants.

No. 04 Civ. 4046 (RJS)
MEMORANDUM AND ORDER

RICHARD J. SULLIVAN, District Judge:

    Defendants Enzo Biochem, Inc. and Enzo Life Sciences, Inc. (collectively, "Enzo") bring counterclaims against Plaintiffs Roche Diagnostics GmbH and Roche Molecular Systems, Inc. (collectively, "Roche"), for breach of contract, tortious interference, and unfair competition under New York law, as well as for patent infringement under federal law.[1] Now before the Court is Roche's motion for summary judgment with respect to these counterclaims. For the reasons set forth below, the Court denies the motion in part and grants it in part.

I. BACKGROUND

A. Facts[2]

    Enzo and Roche are biotechnology companies involved in the research, development, manufacture, and sale of biotechnology products. (First Am. Compl. ¶¶ 1, 4.) In April 1994, Roche – by way of its predecessor-in-interest, Cornage International Ltd. – entered into a

---

[1] The underlying action brought by Roche alleges claims for unfair competition, tortious interference, and declaratory judgment as to patent and contract rights, but these claims are not the subject of the instant motion.

[2] The following facts are taken from the undisputed statements of fact in the parties' joint Rule 56.1 statement (Doc. No. 113 ("56.1 Stmt.")) and the exhibits and declarations attached thereto. In deciding this motion, the Court also considered Roche's brief in support of the motion ("Mem."), Enzo's opposition ("Opp."), and Roche's reply ("Reply").

distribution and supply agreement with Enzo (the "Distribution Agreement" or the "Enzo–Roche Agreement") regarding certain products (the "Products") used in nucleic acid labeling and detection. (56.1 Stmt. ¶ 1, 3.)

Under the Agreement, Roche was authorized to sell and distribute the Products, subject to various restrictions based on the type of Product and its use. (*Id.* ¶ 2.) In particular, the Agreement divided the Products into eight groups – A, A′, C, D, K, K′, E1, and E2 – and imposed group-specific restrictions on each. Additionally, all of the Products were limited to "research use only and [were] not intended for or to be used for diagnostic or therapeutic use." (Decl. of Robert J. Gunther, dated Dec. 21, 2011,[3] Doc. No. 112 ("Gunther Decl."), Ex. 2 (the Distribution Agreement ("DA")) §§ II, XV.)

Between 1998 and 2002, Roche manufactured ten to eleven grams of biotinylated nucleotides ("bio-nucleotides"), which the Distribution Agreement classifies as Group A Products. (56.1 Stmt. ¶ 39; Decl. of Jennifer R. Moore, dated May 1, 2013, Doc. No. 105 ("Moore Decl."), Ex. 4 at 114:5–20; *id.* Ex. 19 at 40:3–44:9; DA § II.A, App'x at 1–2.) The record also indicates that Roche may have provided these bio-nucleotides to Affymetrix – another biotechnology company – in order to help Affymetrix develop a product that would compete with one of Enzo's. (Moore Decl. Ex. 19 at 53:5–20.) In addition to competing with Enzo, Affymetrix also had its own distribution agreement with Enzo (the "Affymetrix Agreement"), under which Affymetrix was to purchase terminal transferase, another biotechnology product, exclusively from Enzo. (*Id.* Ex. 32 § 1.a, 1.c; *id.* Ex. 32 at Ex. B (list of products under the Affymetrix Agreement).) Notwithstanding the Affymetrix Agreement,

---

[3] Although Mr. Gunther's declaration is dated December 21, 2011, the Court notes that it was submitted on December 21, 2012, the date on which Roche initially filed its motion for summary judgment. (Doc. Nos. 93, 94.)

Affymetrix used Roche's terminal transferase rather than Enzo's. (*Id.* Exs. 35–38 (e-mails indicating Affymetrix's use of Roche's terminal transferase).)

The Enzo–Roche Agreement became effective on April 25, 1994 and was scheduled to terminate upon the expiration of the last Enzo patent listed in Exhibit A to the Agreement. (DA § XIV.) As certain Enzo patents expired, however, Roche began to withhold some payments and to make others under reservation, and by July 2004, Roche altogether ceased making payments to Enzo under the Distribution Agreement. (56.1 Stmt. ¶¶ 10–11.)

B. Procedural History

Roche commenced this action by filing the Complaint on May 28, 2004 (Doc. No. 1), and on January 21, 2005, it filed the Amended Complaint (Doc. No. 16). Enzo filed its First Amended Answer and Counterclaims (the "FAAC") on February 22, 2005 (Doc. No. 18), asserting the claims for breach of contract, patent infringement, tortious interference, and unfair competition that are at the heart of the instant motion.

This case was originally assigned to the Honorable John E. Sprizzo, District Judge, but after Judge Sprizzo passed away in December 2008, the case was reassigned to my docket on January 8, 2009. (Doc. Nos. 5, 39.) From March 13, 2009 until August 25, 2011, this action was stayed while a related case was appealed to the Federal Circuit. (Doc. Nos. 44, 65, 67.) On September 24, 2012, following a renewed round of briefing by Roche and the defendants in related patent-infringement cases, the Court granted in part and denied in part Roche's motion for summary judgment with respect to multiple patent claims asserted by Enzo. (Doc. No. 83.)

Roche filed the instant motion for summary judgment on April 11, 2013, focusing on Enzo's non-patent claims and asserting a contractual basis for dismissing Enzo's remaining patent claims. (Doc. No. 102.) After receiving leave to take additional discovery ahead of Roche's motion, Enzo filed its opposition on May 2, 2013. (Doc. No. 107.) Roche replied on

3

May 16, 2013. (Doc. No. 111.) On August 21, 2013, Roche submitted supplemental authority in support of its motion (Doc. No. 116), to which Enzo responded on August 28 (Doc. No. 118). Finally, on October 7, 2013, Roche sought leave to supplement the summary judgment record, which the Court denied on October 23, 2013. (Doc. No. 126.)

## II. LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56(a), a court may not grant a motion for summary judgment unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The moving party bears the burden of showing that it is entitled to summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The Court "is not to weigh evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (internal quotation marks omitted); *accord Anderson*, 477 U.S. at 249. As such, "if there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment." *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (internal quotation marks omitted).

## III. DISCUSSION

Roche moves for summary judgment on Enzo's counterclaims for breach of contract, patent infringement, tortious interference, and unfair competition. The Court will address these claims in turn.

A. Breach of Contract

Enzo asserts three distinct breaches of the Distribution Agreement. (Mem. at 1–2.)[4] First, it claims that Roche violated the Agreement's research-only use restrictions. (FAAC ¶ 54(3); Opp. at 5–8, 11–13.) Second, it contends that Roche manufactured bio-nucleotides for its own use rather than purchasing its bio-nucleotide requirements from Enzo under the Agreement. (FAAC ¶ 54(2); Opp. at 8–11, 16–17.) Finally, Enzo claims that Roche failed to make payments for the Products that it sold after the patents covering those Products expired. (Opp. at 13–16.)

Roche seeks summary judgment on each of these three breach-of-contract claims. Under New York law, the first step in assessing a contract claim is to determine "'whether the contract is unambiguous with respect to the question disputed by the parties.'" *Law Deben. Trust Co. v. Maverick Tube Corp.*, 595 F.3d 458, 465 (2d Cir. 2010) (quoting *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002)). That "is a question of law for the court." *Id.* "Summary judgment is appropriate if the terms of the contract are unambiguous." *Fischer & Mandell LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011) (citing *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008)). "On the other hand, under New York law, contract claims are generally not subject to summary judgment if the resolution of a dispute turns on the meaning of an ambiguous term or phrase." *Fed. Ins. Co. v. Am. Home Assur. Co.*, 639 F.3d 557, 567 (2d Cir. 2011) (citing *State v. Home Indem. Co.*, 495 N.Y.S.2d 969, 971 (1985)) (other citation omitted). "However, where language in a contract is ambiguous, summary judgment can be granted 'if not the non-moving party fails to point to any relevant

---

[4] Enzo has abandoned two other breaches that it alleged in the FAAC: (1) that Roche sold, distributed, and/or developed Products that were not explicitly listed in the Agreement but that were somehow covered by the Agreement, and (2) that Roche purchased Products from suppliers other than Enzo. (*Compare* FAAC ¶ 54, *with* Opp. at 1–2.)

extrinsic evidence supporting that party's interpretation of the language.'" *Id.* (quoting *Co. Fin. de CIC et de L'Union Euro. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 158 (2d Cir. 2000)).

### 1. Use Restrictions

Enzo's first breach-of-contract claim contends that Roche violated use restrictions imposed by the Enzo–Roche Agreement. The Court concludes that the use restrictions in the Distribution Agreement are ambiguous and that Enzo has produced evidence that supports its interpretation contract, so summary judgment is not appropriate.

Under the Agreement, Enzo appointed Roche as a "nonexclusive distributor for the distribution and sale of Products to the research market subject to the conditions of [the] Agreement." (DA § II.) The Agreement further explained that "all Products are for research use only and are not intended for or to be used for diagnostic or therapeutic use." (DA § XV.) Unhelpfully, the Agreement does not define "research market" or "research use," and critically, the Distribution Agreement never clarifies whether the research market includes applied research or only basic research or some sort of middle ground between the two. As a result, these restrictions are ambiguous. Because Enzo has provided evidence that would tend to prove that the Distribution Agreement forbade sales to "pharmaceutical and industrial/diagnostics companies . . . [whose] efforts, including research, ultimately are directed to the development and marketing of commercial products, such as drugs, for diagnostic and therapeutic purposes" (Decl. of Elazar Rabbani, dated Apr. 30, 2013, Doc. No. 104, ¶ 5), the Court cannot conclude as a matter of law that Roche did not breach the Distribution Agreement when it sold Products to (1) Oncor for putatively diagnostic uses (Moore Decl. Ex. 14 at 28; *id.* Ex. 15); (2) non-parties Roche Pharma and Roche Vitamins for the development of cancer-research products (*see* Gunther Decl. Ex. 10 ¶ 5; Moore Decl. Ex. 19 at 53:15–20; *id.* Exs. 48, 49; Opp. at 10–11); or

6

(3) Quest Diagnostics, which the evidence suggests provides *only* diagnostic services and which Roche's sales spreadsheet lists under "Industrial/Diagnosti[c]" sales (Moore Decl. Ex. 12 at 10–12, 13–15; *id.* Ex. 13).

To stave off this use-restriction claim, Roche notes that it was "not prohibited from selling products to commercial entities that were intending to use (or did use) those products in a research setting." (Mem. at 12.) Roche's observation is true to a point. Nothing in the Distribution Agreement indicates that Roche was barred from selling Products to commercial entities – it is conceivable that a commercial Product-buyer might conduct "research" within the meaning contemplated by the Distribution Agreement. The trouble with Roche's argument is that it is not clear what, precisely, constitutes a "research setting" as that term is used by Roche. Given this ambiguity, and for the reasons explained above, the Court cannot conclude that Roche's sales did not exceed the research-only restrictions in the Distribution Agreement. Accordingly, summary judgment as to this claim is denied.

2. Manufacturing Products

Enzo next contends that Roche manufactured ten to eleven grams of bio-nucleotides even though the Distribution Agreement required that Roche purchase such Products from Enzo. However, the plain language of the Enzo–Roche Agreement does not impose any limitation on Roche's production of bio-nucleotides for its personal use; it prohibits Roche only from purchasing bio-nucleotides from other sellers. (DA § II.A (requiring Roche to "purchase exclusively from Enzo[,] . . . such quantities of the Group A Products as [Roche] may order in accordance with th[e] Agreement").) Therefore, Roche is entitled to summary judgment on this claim.

The Distribution Agreement divided Products into several groups, classifying bio-nucleotides as a "Group A Product" (DA § II, App'x at 1–2; Opp. at 8–9; Reply at 7–9), and the

7

record supports a finding that Roche manufactured bio-nucleotides for its own use (56.1 Stmt. ¶ 39; Moore Decl. Ex. 4 at 114:5–20; *id.* Ex. 19 at 40:3–44:9). Pursuant to Section II.A of the Agreement, for Group A Products, Roche and Enzo agreed that "Enzo or its designee [would] manufacture, sell[,] and deliver to [Roche,] and [that Roche would] purchase exclusively from Enzo[,] . . . such quantities of the Group A Products as [Roche] may order in accordance with th[e] Agreement." (DA § II.A.) Notably, this language says nothing about Roche satisfying *all* of its requirements for Group A Products by purchasing them from Enzo. Rather, it says that Roche must "purchase exclusively from Enzo" any of those Products that "Roche may order." To the extent that Roche stepped outside the confines of the Agreement by manufacturing its own bio-nucleotides, presumably it risked a patent-infringement challenge from Enzo. But as a matter of contract, the Court does not see how the plain language of this clause could be stretched to prohibit Roche from developing and manufacturing its own Group A Products when the Agreement's terms only prohibit Roche's *purchase* of such Products. *See Bristol-Myers Squibb Co. v. Matrix Labs. Ltd.*, 12 Civ. 5846 (PAE), 2013 WL 4056219, at *7–8 (S.D.N.Y. Aug. 12, 2013) (concluding that, where certain product sales were not addressed by a contract and were thus not prohibited by the contract, a contract claim would not lie but that a patent claim might nonetheless be actionable because the contract did not immunize such sales).

This conclusion is reinforced by other provisions of the Distribution Agreement. For example, Section III.A demonstrates that the parties used the traditional requirements-contract phrasing when they sought to establish such a provision: "Enzo shall purchase its requirements for Group A′, C, and K′ Products from [Roche]." (DA § III.A.) Had the parties sought to place a similar restriction on Roche with respect to bio-nucleotides, they certainly knew how to draft it, but they obviously declined to do so. *See Network Publ'g Corp. v. Shapiro*, 895 F.2d 97,

8

99 (2d Cir. 1990). Accordingly, the Court grants summary judgment in favor of Roche on Enzo's claim for breach of Section II.A of the Distribution Agreement.

### 3. Payments for Products

Enzo's final breach-of-contract claim asserts that Roche failed to make payments for Products that it sold after Enzo's patents, which covered the relevant Products, had expired. Because Enzo never alleged this breach of contract in its pleadings, the Court grants summary judgment in favor of Roche.

In its list of counterclaims, the FAAC makes no mention of Roche's failure to comply with the payment provisions of Section IV of the Agreement, even though Enzo filed its counterclaims in 2005 – more than a year after Roche allegedly started skipping payments on Products. (*See generally* FAAC ¶¶ 47–59 (Enzo's claims for breach of contract).) The Court will not permit Enzo to raise new claims for breach of contract at this late stage. It is well settled that a party may not amend its pleadings in its briefing papers. *See Avillan v. Donahoe*, 483 F. App'x 637, 639 (2d Cir. 2012) (citing *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998)); *see also Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 170 F.R.D. 111, 119 (S.D.N.Y. 1997) ("[I]t is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment."). Indeed, in 2007, while this case was assigned to Judge Sprizzo, Enzo was explicitly warned: "It's not what you argue[;] it's what's in your complaint." *Roche Diagnostics GMBH v. Enzo Biochem, Inc.*, 04 Civ. 4046 (JES) (S.D.N.Y. July 18, 2007), *available at Enzo Biochem, Inc. v. Amersham, plc.*, No 02 Civ. 8448 (JES), Doc. No. 199 (S.D.N.Y. July 18, 2007). To the extent that Enzo omitted certain contract claims from the pleadings, it certainly cannot raise them in its summary judgment brief filed long after discovery has concluded and almost nine years after the FAAC was filed. *See Caribbean Wholesales & Serv. Corp v. U.S. JVC Corp.*, 963 F. Supp. 1342, 1359 (S.D.N.Y. 1997) ("[Plaintiff] in effect is

apparently attempting to add a [different contract] claim never addressed, or even hinted at, in the complaint. Such a step is inappropriate at the summary judgment stage, after the close of discovery, without the Court's leave, and in a brief in opposition to a dispositive motion."); *First Am. Commercial Bancorp, Inc. v. Saatchi & Saatchi Rowland, Inc.*, 865 N.Y.S.2d 424, 428 (App. Div. 2008) (holding that a party may not simply allege a general breach of contract and, later on, sort out the specific breach that it intends to litigate); *see also Enzo Biochem, Inc. v. Amersham plc*, No. 02 Civ. 8448 (RJS), 2013 WL 5943985, at *4 (S.D.N.Y. Oct. 22, 2013) (citing cases in related action). Accordingly, the Court grants Roche's motion for summary judgment on this claim.

### B. Patent Infringement

Roche moves for summary judgment on Enzo's patent claims on the theory that the Distribution Agreement authorized Roche to use Enzo's patented property. To the extent that Roche can show that its use of the Products was permitted under the terms of the Distribution Agreement, Roche may well be insulated from liability for patent infringement. Nevertheless, because the Court has concluded that the Distribution Agreement is ambiguous, and cannot conclude as a matter of law that Roche's activities fell within the Agreement's use authorization, Enzo's patent infringement claims remain viable. Accordingly, the Court cannot grant summary judgment as to the remaining patent claims.

### C. Tortious Interference

In addition to its claims for breach of contract and patent infringement, Enzo also asserts a claim for tortious interference with contract. Specifically, Enzo contends that it had a valid contract with Affymetrix, but that Affymetrix breached that Agreement when it began dealing with Roche. (Opp. at 20–23.) At the outset, the Court notes that the FAAC styles Enzo's claim as one for tortious interference with *business relations* (FAAC ¶¶ 76–83), which is a different

cause of action consisting of different elements than tortious interference with *contract*. *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115, 132 (2d Cir. 2008) ("The [additional] wrongful means requirement [for tortious interference with business relations] makes alleging and proving a tortious interference claim with business relations 'more demanding' than proving a tortious interference with contract claim." (quoting *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 428 N.Y.S.2d 628, 632 (1980))). As stated above, summary judgment is warranted on this basis alone – a party may not amend its cause of action in its brief opposing summary judgment. *See Avillan*, 483 F. App'x at 639. Nevertheless, even if the Court reached the merits of Enzo's claim, it would still fail.

Under New York law, a claim for tortious interference with contract requires: "(1) 'the existence of a valid contract between the plaintiff and a third party'; (2) the 'defendant's knowledge of the contract'; (3) the 'defendant's intentional procurement of the third-party's breach of the contract without justification'; (4) 'actual breach of the contract'; and (5) 'damages resulting therefrom.'" *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401–02 (2d Cir. 2006) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 646 N.Y.S.2d 76, 82 (1996)). Here, there is sufficient evidence from which a reasonable juror could conclude that Enzo and Affymetrix had entered into a contract. (Moore Decl. Ex. 32.) However, Enzo has not provided evidence that Roche knew about the Affymetrix Agreement or that it intended to induce Affymetrix's breach.

With regard to knowledge, Enzo's evidence does not show that Roche had *actual* knowledge of the Affymetrix Agreement – only that the contract was published in Affymetrix's quarterly filing with the SEC. (56.1 Stmt. ¶ 26 (citing Moore Decl. Ex. 33); Opp. at 21 (same).) That sort of constructive knowledge is inadequate to demonstrate Roche's knowledge for purposes of tortious interference. *See Monex Fin. Servs. Ltd. v. Dynamic Currency Conversion, Inc.*, 859 N.Y.S.2d 904, at *7 (Sup. Ct. Mar. 26, 2008) (citing *Burns Jackson Miller Summit &*

11

*Spitzer v. Lindner*, 452 N.Y.S.2d 80, 93 (App. Div. 1982) (noting the historical requirement of "actual knowledge on the part of the defendant of the contract's existence" and applying that actual knowledge requirement to tortious interference with business relations); *AA Tube Testing Co. v. Sohne*, 246 N.Y.S.2d 247, 248 (App. Div. 1964) ("As an essential element of the cause of action sought to be pleaded the plaintiff must allege that the defendants had *actual* knowledge; an allegation that they 'should have known' of the existence of the contract is insufficient."); *Roulette Records, Inc. v. Princess Prod. Corp.*, 224 N.Y.S.2d 204, 207 (App. Div. 1962) (reversing a tortious interference judgment for lack of evidence of "actual knowledge"). Therefore, Enzo's claim fails on this element.

Likewise, Enzo has not provided evidence of Roche's intent. To satisfy this element, it is not enough that a defendant engaged in conduct with a third-party that happened to constitute a breach of the third party's contract with the plaintiff; instead, the evidence must show that the defendant's objective was to procure such a breach. *See High Falls Brewing Co., LLC v. Boston Beer Corp.*, 513 F. App'x 12, 13 (2d Cir. 2013) (citing *White Plains Coat & Apron Co. v. Cintas Corp.*, 835 N.Y.S.2d 530, 532 (2007)); *see also id.* at 13–14 (requiring that "the target of [defendant's] conduct was [the third party's] contractual arrangements with" the plaintiff). Put simply, a defendant must specifically intend to interfere with the relevant contract. *Am. Cyanimid Co. v. Elizabeth Arden Sales Corp.*, 331 F. Supp. 597, 608 (S.D.N.Y. 1971) (citing *Lamb v. S. Cheney & Son*, 125 N.E. 817, 818 (N.Y. 1920)). On this element, the evidence shows only that, in contravention of the Affymetrix Agreement, Affymetrix used component terminal transferase provided by Roche. (Moore Decl. Ex. 32 § 1(a), Ex. B (Affymetrix Agreement, including terms for component terminal transferase); *id.* Exs. 35–38 (e-mails indicating

12

Affymetrix's use of Roche's component terminal transferase).)[5] It may be that Affymetrix breached its contract with Enzo by using Roche's terminal transferase, but that fact alone would not support the inference that Roche was *targeting* the contract between Enzo and Affymetrix. Consequently, Enzo cannot show that Roche possessed the requisite intent. *High Falls Brewing Co.*, 513 F. App'x at 13–14.[6]

Without evidence that Roche knew about the Affymetrix Agreement or intentionally induced Affymetrix to breach it, Enzo could not carry a claim for tortious interference with contract, even if it *had* asserted that claim in its pleadings. Accordingly, the Court grants summary judgment in Roche's favor on this claim.

### D. Unfair Competition

Finally, Enzo contends that Roche engaged in unfair competition in violation of New York state law. This claim simply repeats the earlier claims against Roche for "sales of Enzo's Products outside of the research market" and for Roche's "collaborat[ion] with Affymetrix to develop AmpliChip CYP450 and other products." (Opp. at 24.) Enzo argues that "Roche engaged in these acts in bad faith and was unjustly enriched. In acquiring Enzo Products with knowledge of the market and use restrictions, and procuring the breach of the Enzo–Affymetrix Agreement, Roche ultimately ended up competing with Enzo in a market it was never entitled to

---

[5] Enzo also seeks to prove intent by arguing that Affymetrix sought Roche's assistance in replacing Enzo's labeled nucleotides and developing a product to compete with one of Enzo's, but Enzo does not cite to record evidence that supports this assertion. (Opp. at 22.) Nevertheless, for the same reasons as above, such evidence would not save Enzo's claim.

[6] Enzo posits that the element of intent is satisfied because Roche was aware of the Affymetrix Agreement and nevertheless participated in activity with Affymetrix by which Affymetrix breached that contract. Setting aside the lack of evidence of Roche's knowledge of the Affymetrix Agreement, Enzo predicates its faulty intent argument on a misreading of nonbinding precedent from this district. In *Don King Prods., Inc. v. Douglas*, 742 F. Supp. 741, 775 (S.D.N.Y. 1990), Judge Sweet noted that, if a "defendant . . . interfered[, with] knowledge of the *existence* of the contract, . . . [that] may suffice to imply" the requisite intent for purposes of tortious interference. *Id.* (citing *Am. Cyanamid*, 331 F. Supp. at 608) (quotation marks and citation omitted). However, Judge Sweet's formulation was predicated on an earlier determination that there was, in fact, sufficient evidence to infer that the defendant "acted intentionally to induce [the] breach." *Id.* at 772, 774. Here, Enzo has not uncovered any evidence of knowledge, let alone intentional inducement.

13

enter." (*Id.*) Notably, this section of Enzo's brief makes no citation to the record nor does it bear any relation to the common law cause of action for unfair competition.

New York has "long recognized two theories of common-law unfair competition: palming off and misappropriation." *ITC Ltd. v. Punchgini, Inc.*, 850 N.Y.S.2d 366, 372 (2007) (answering the Second Circuit's certified question with respect to the reach of a claim for unfair competition) (citations omitted). "Palming off" is the "sale of the goods of one manufacturer as those of another," which is neatly illustrated by "a defendant [who] substitute[s] its product for plaintiff's when customers specifically asked for the plaintiff's product." *Id.* at 372 & n.2 (quotation marks, citations, and alterations omitted). The related theory of "misappropriation" relies on the "principle that one may not misappropriate the results of the skill, expenditures[,] and labors of a competitor" and is best illustrated by a defendant's arrogation of the goodwill of the plaintiff by using the plaintiff's name, trademark, or trade dress. *Id.* at 372–73. The essence of both of these claims is that a "defendant assembled a product which bears so striking a resemblance to the plaintiff's product that the public will be confused as to the identity of the products." *Shaw v. Time-Life Records*, 379 N.Y.S.2d 390, 395 (1975) (citations omitted); *see also Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 34 (2d Cir. 1995) ("The essence of unfair competition under New York common law is the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods." (quotation marks, citations, and alterations omitted)).[7] Because nothing

---

[7] Enzo selects language from Second Circuit opinions that predate *ITC Limited* to imply that a cause of action for unfair competition reaches further than it actually does. Enzo insists that unfair competition law is "broad and flexible" and "encompass[es] any form of commercial immorality, or simply as endeavoring to reap where one has not sown." (Opp. at 24 (citing *Telecom Int'l Am., Ltd. v. AT&T Corp.*, 280 F.3d 175, 197–98 (2d Cir. 2001).) Although, prior to the New York Court of Appeals' holding in *ITC Limited*, Second Circuit dicta broadly construed the cause of action for unfair competition, *see, e.g., id.*, it is now clear that "[t]he tort is not all-encompassing," *Nationwide CATV Auditing Servs., Inc. v. Cablevision Sys. Corp.*, No. 12 Civ. 3648 (SJF) (ETB), 2013 WL 1911434, at *10 (E.D.N.Y. May 7, 2013). To the contrary, "in rejecting the notion that unfair competition is equivalent to the amorphous term 'commercial unfairness,'" the New York Court of Appeals "has stated that misappropriation of another's commercial advantage is a cornerstone of the tort." *Id.* (quotation marks and citations

14

in Enzo's arguments with respect to this claim – let alone in the record – demonstrates that Roche caused the public to confuse the identity of Roche products with Enzo products, Enzo has missed the mark for unfair competition. Accordingly, the Court grants summary judgment on this claim.

IV. CONCLUSION

For the reasons stated above, summary judgment is denied with respect to Enzo's claim that Roche violated the use restrictions in the Distribution Agreement, but Roche's motion is granted in all other respects. The Clerk of the Court is respectfully directed to terminate the motion pending at Doc. No. 102.

IT IS HEREBY ORDERED THAT this case will proceed to trial and that, by December 20, 2013, the parties shall submit a joint letter setting forth which, if any, of Roche's claims against Enzo are still live and proposing a trial date and a pretrial schedule, including discovery deadlines for the issue of damages.

SO ORDERED.

DATED:   December 6, 2013
         New York, New York

*[signature]*

RICHARD J. SULLIVAN
UNITED STATES DISTRICT JUDGE

---

omitted); *accord Randa Corp. v. Mulberry Thai Silk, Inc.*, No. 00 Civ. 4061 (LAP), 2000 WL 1741680, at *4 (S.D.N.Y. Nov. 27, 2000); *see also Ruder & Finn v. Seaboard Sur. Co.*, 439 N.Y.S.2d 858, 862 (1981) ("[T]he . . . phrase 'unfair competition' is not to be equated with the far more amorphous term 'commercial unfairness.'").

\*   \*   \*

Enzo is represented by Michael Burrows, Scott J. Bornstein, Jeffrey R. Mann, Ronald D. Lefton, Richard C. Pettus, and Jennifer R. Moore of Greenberg Traurig, LLP, 200 Park Avenue, New York, New York 10166, and Victor H. Polk, Jr. of Greenberg Traurig, LLP, One International Place, Boston, Massachusetts 02110.

Roche is represented by Robert J. Gunther and Omar A. Khan of Wilmer Cutler Pickering Hale and Dorr, LLP, 7 World Trade Center, New York, New York 10007.