**TO BE FILED UNDER SEAL AND REVIEWED *IN CAMERA***

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ENZO BIOCHEM, INC., et ano., Plaintiffs, v. MOLECULAR PROBES, INC., Defendant, | 03 Civ. 3816 (RJS) |
| ENZO BIOCHEM, INC., et ano., Plaintiffs, v. PERKINELMER, INC., et ano., Defendants, | 03 Civ. 3817 (RJS) |
| ROCHE DIAGNOSTICS GMBH, et ano., Plaintiffs, v. ENZO BIOCHEM, et ano., Defendants, | 04 Civ. 4046 (RJS) **DECLARATION OF MICHAEL BURROWS IN SUPPORT OF GREENBERG TRAURIG, LLP's MOTION TO DETERMINE THE MONETARY VALUE OF ITS CHARGING LIEN** |

I, MICHAEL BURROWS, declare as follows:

1. I am a member of the Bar of the State of New York and of this Court. I was admitted to practice in the Southern District of New York in 1974 and have practiced commercial litigation in New York continuously since that date.

2. I am a shareholder in the New York office of Greenberg Traurig, LLP ("GT"), previously attorneys for Enzo Biochem, Inc. and Enzo Life Sciences, Inc. (together "Enzo") in the above actions (the "Actions"). I submit this Declaration in support of GT's motion to

determine the monetary value of its charging lien as set forth in the Court's Sealed Memorandum and Order, dated May 9, 2014 ("Order").[1]

3. Also submitted in support of GT's motion are the declaration of Jeffrey R. Mann ("Mann June Decl.") and a Memorandum of Law, both dated June 25, 2014.

4. The Order granted GT's motion to withdraw as counsel and found that such withdrawal was for "good cause." Order at 7. The Court stated: "IT IS FURTHER ORDERED THAT Greenberg Traurig is entitled to a charging lien, with the amount to be determined by the parties or the Court at a later date." *Id.* at 8. The Court did not set a value for the lien:

> Without further briefing on the issue, the Court thinks it wise to allow the parties to attempt to settle upon an amount without judicial intervention. Accordingly, the Court will defer a determination of a specific amount until it is asked to do so.

*Id.* (citation omitted).

5. The parties have been unable to agree. As a result, on June 16, 2014, the Court directed GT to submit its initial brief no later than June 25, 2014.[2]

## BACKGROUND FACTS

6. The background facts underlying this motion and the history of this litigation are set forth in my two previous declarations, dated March 17 and April 7, 2014 ("Burrows March Decl." and "Burrows April Decl.", as well as the declaration of Jeffrey R. Mann, dated April 7,

---

[1] Judge Sullivan's Order was filed under seal. A redacted copy of the Order was filed in *PerkinElmer* (No. 03 Civ. 3817) (RJS) Doc. No. 257.

[2] The Court's June 16th direction also sets out a briefing schedule and the Court's instructions in connection therewith.

2014 ("Mann April Decl."). Each of those three declarations is incorporated herein by reference and made a part hereof as though fully set forth.

7. I have been in charge of the Enzo Litigation (defined below) since approximately November 2012

*See* Burrows April Decl. ¶¶ 37-38.

8. In summary, the three actions captioned above have been pending for more than 10 years. They and five other cases were commenced by and against Enzo between October 2002 and May 2004 (collectively, the "Enzo Litigation" or the "Enzo Cases"). The complaints on behalf of Enzo, as plaintiff, were filed in the first seven cases by law firms other than GT. The eighth complaint was filed by Roche Diagnostics against Enzo in May 2004; GT appeared for Enzo and submitted counterclaims.

9. The eight cases contained claims by Enzo for patent infringement and breach of contract as well as claims by the opposing parties for declaratory judgment and breach of contract. At issue were nine patents owned by Enzo as well as distribution agreements between Enzo and the defendants (and counterclaim defendants). It was anticipated by Enzo that the claims in the Enzo Litigation would with *Roche*

**THE ENGAGEMENT LETTER**

10. In February of 2004, Robert H. Cohen joined GT's New York office as a shareholder. Among the clients that Mr. Cohen brought with him to GT were the Enzo companies. Mr. Cohen is a corporate lawyer and had represented Enzo since 1985. From the time he joined GT until his departure in December 2012, he was the "billing partner" and "relationship partner" and was responsible for all of the Enzo legal work, not just litigation.

11. When Mr. Cohen brought in the Enzo Cases, GT and Enzo negotiated and signed a retainer agreement which provides that GT will be paid partially on a discounted hourly basis and partially on a contingency basis. Enzo agreed to pay GT, within 30 days of submission of its invoices, GT's hourly billings, plus 100% of its disbursements.

12. The retainer agreement provides further that following termination of the lawsuits, GT would, at its option, be entitled any recovery,[3] or A copy of the Enzo-GT retainer agreement, dated May 26, 2004 (together with GT's General Provisions) is annexed hereto as Exhibit 1 (the "Engagement Letter" or the "Representation Letter").

13. The Engagement Letter also sets forth the compensation that GT is to receive in the event the firm withdraws from the Enzo Litigation -- if such withdrawal is "for good cause." If GT withdraws for "good cause," Enzo is required to reimburse GT for costs previously incurred and GT is entitled to receive, at its sole option, either (a) a percentage any "recovery" received by Enzo, or (b) billed to Enzo, to be paid within 15 days:

> Enzo understands and agrees that GT may withdraw as counsel for Enzo for good cause. "*Good Cause*" shall include without limitation, the failure of Enzo to cooperate with its attorneys or comply with this Agreement, or their request that GT or its attorneys act in a manner that would violate the Rules of Professional Conduct. Such withdrawal shall not affect Enzo's obligations to reimburse GT for costs previously incurred. Enzo may terminate this Agreement for good cause with thirty

---

[3] "Recovery" as defined, *see* Ex. 1, p. 2, 1st full ¶ ("As used herein, Recovery shall mean any non-appealable judgment, or settlement, license or other payment or credit whatsoever to Enzo (or for Enzo's benefit) or Enzo's obtaining, as a result of the lawsuit, any right, property, license, covenant, agreement or anything else which has value to Enzo which Enzo receives from any of [the defendants]").

> days written notice to GT. Upon termination or withdrawal, GT, at its sole option, will be paid the greater of less any Recovery amounts previously received by GT in connection with this case, This means fifteen percent (15%) of whatever Enzo receives as a result of such Recovery for the entire period during which such Recovery is paid.

Ex. 1 at 2 (emphasis added). Enzo has made no payment "within fifteen (15) days."

14. calculation in the Engagement Letter, if applied to the fees and disbursements billed to Enzo since the inception of the Enzo Litigation, would result in a charging lien of approximately

15. Attached as Exhibit 2 is a Summary of GT's billed fees at and disbursements from May 26, 2004, the date of the Engagement Letter through April 30, 2014, the end date of the last bill sent to Enzo. The Summary in Exhibit 2 is taken from and based on GT's regular accounting records kept in the ordinary course. It reflects the calculation.[4]

16. is the amount of the charging lien to which GT is contractually entitled. The Court may determine that a different amount may be set.

17. The Court could determine that more appropriately the charging lien should be set in the amount of GT's unpaid fees and disbursements which gave rise to its motion to withdraw, $7 million settlement recently reached in the PerkinElmer case (*see* ¶¶ 58-62, *infra*), any settlements or judgments which may be reached or obtained in the still pending MPI and Roche cases.

---

[4] It does not include as costs the very recent payments to Dr. Azarani and Adam Cole *see* ¶¶ 47 - 54, *infra*.

18. GT's contractual entitlement under the Engagement Letter may not be consistent with the factors which courts may consider in the absence of an agreement. Nevertheless, fair compensation is appropriate (a) for and (b) in recognition of the agreed payment upon withdrawal for good cause.

**MOTION TO WITHDRAW**

19. On March 17, 2014, GT filed its motion to withdraw based on

20. The motion was briefed and a hearing was held, on the record, *in camera*, on April 21, 2014 (hereinafter "Tr."). The Court

21. The Court also found GT's withdrawal to be for "good cause" and that GT is entitled to a charging lien. Judge Sullivan agreed to resolve the lien issue if asked. *Id.* at 7-8.

**ENZO'S ATTEMPT TO RENEGOTIATE WITH GT**

22. For eight years, from 2004, when Mr. Cohen joined GT, until December 2012, when he left the firm and moved to McDermott Will & Emery, Enzo and Dr. Rabbani were satisfied with our bills and with our work.

23. All of the bills from 2004 until Mr. Cohen left were paid regularly -- as rendered without objection or complaint.

24. When Mr. Cohen left, things changed immediately. Enzo paid no bills for the next four months.

25. Finally, at the end of March 2013, in an effort to accommodate Enzo's request, GT agreed that it would substantially reduce its fees and bill Enzo for the months of April, May, June, and July 2013, a time period which Dr. Rabbani and I discussed and which we knew would be extremely busy.

26. That agreement was negotiated with the involvement of Mr. Cohen and reflected in an email from Scott Bornstein, Chair of GT's New York IP & Technology Department, to Dr. Rabbani dated April 15, 2013. Exhibit 3 hereto.[5] Neither Dr. Rabbani nor anyone else at Enzo objected or responded to Mr. Bornstein's email.

27. As these bills were rendered I discussed with Dr. Rabbani the work that was being done and the amount of the bills. He told me that he was satisfied with the work, although he wished the cases were moving faster. He said he was "ok" with the amounts of the bills although he continued to urge me to "be more efficient" and "control costs." I told him repeatedly that we were prosecuting six cases, not one, and that bills of this size were a result of suing six major pharmaceutical companies simultaneously in a high-cost jurisdiction.

28. When agreement came to an end, on July 31, 2014, Enzo paid the next bill for work done during August -- and disbursements -- without objection.

---

[5] As part of the agreement, Enzo agreed to pay its outstanding bills for December through March over a period of four months. (Marty Kaminsky, referred to in Exhibit 3, is GT's General Counsel.)

29. After August, Enzo stopped paying our fees.[6]

30. In or about October and November, I continued to discuss the bills with Dr. Rabbani as they were rendered. He told me he understood that we were pursuing six cases and that defendants were defending only one case each, but he said he would not pay unless we changed the fee arrangement; he said he had malpractice claims against GT. *See* Tr. at 8-10.

31. As the Court knows from my earlier declaration, GT said it would agree to reduce its bills for the balance of the Enzo Litigation if Enzo would make, in addition, a lump sum payment at the end of 2013 and each year thereafter as long as the cases continued. Burrows April Decl. at ¶ 25.

32. This proposed agreement did <u>not</u> include a waiver, reduction, or any compromise of component of the Engagement Letter. Tr. at 29-30.

33. Dr. Rabbani never responded to our proposal and Enzo made no payment at the end of 2013. Burrows March 2014 Decl. at ¶ 29, April Decl. at ¶ 28.

**<u>GT'S SERVICES - JANUARY THROUGH MARCH, 2014</u>**

34. The work performed in January, February, and March of 2014 was at a breakneck pace. As the Court is aware, two trials were scheduled, *PerkinElmer* and *Affymetrix*. *See* Mann June Declaration ¶¶ 24 - 31.

35. GT continued its efforts and despite Enzo's non-payment and The non-payment issues became more

---

[6] Enzo paid GT's disbursements for the months of September and October 2013, but no more fees. Dr. Rabbani told me he had been advised by counsel that if Enzo remained current on the disbursements, GT would not be permitted to withdraw. Later, however, Enzo also stopped paying disbursements.

serious in January and February

*See* Mann April Decl. ¶¶ 19-34.

36. These months were perhaps the busiest since the inception of the cases.

**GT'S BILLS WERE REASONABLE - PERKINELMER SPENT $3.2 MILLION**

37. By way of comparison and relevant to the reasonableness of GT's fees, I note here that PerkinElmer incurred $3.2 million in legal expenses during the same period of time -- the first three months of 2014. This according to its Form 10Q as filed with the SEC for the quarter ended March 31, 2014:

> We expected this case to go to trial in March 2014 and incurred $3.2 million of expenses in preparation for the trial during the first three months of fiscal year 2014. The trial date was delayed, however, we continue to expect the case to go to trial in 2014.

PerkinElmer, Inc., Form 10-Q for the quarterly period ended March 31, 2014 at 40; pages 1, 2, and 40 are attached hereto as Exhibit 4.

38. GT's fees incurred during the same three months totaled

but we were actively working on four cases; PerkinElmer was paying legal fees in only one case.[7]

39. GT's billed but unpaid fees relate to the months of September through April, 2014, plus a bill dated December 10, 2012 that was sent to Enzo by Mr. Cohen immediately before his departure from GT, but was never paid. Each of those bills was rendered in good faith

[7] The fees for that three-month period were billed to Enzo

and submitted to Enzo at the agreed (and re-agreed) Also outstanding are the disbursements portion of bills for the months of April and May 2013.[8]

40. All of the bills to Enzo were based on GT's usual and customary billing rates for the applicable time period. No special or different rates (higher or lower) were applied to Enzo's bills. However, the billing rates did increase over time. These increases were in accord with the Engagement Letter which provides:

> GT's fees will be based primarily on the billing rates charged by each attorney, which currently range from $255 an hour for new associates to $650 an hour for the most senior attorneys. These billing rates are subject to adjustment from time to time by the firm.

Ex. 1, Engagement Letter at 2-3.

41. All of the hourly rates, including as they increased over time, were and are competitive and customary in the New York City legal market. The bills were sent to Enzo on or about the dates indicated and Enzo has never stated that it did not receive a bill for any month related to the Enzo Litigation.

42. Moreover, Enzo has never objected to any portion, any specific section, or any identified time entry regarding work performed or reflected in the bills submitted to it. I discussed most, probably not all, of the bills shortly after they were rendered to Enzo. I explained to Dr. Rabbani the work that was done and, time and time again, reiterated that we

---

[8] The last bill sent to Enzo by Mr. Cohen before he left GT remains unpaid in the amount In addition, Enzo refused to pay the disbursements in the 2013 bills because those bills included charges for temporary "contract attorneys." *See* Burrows April Decl. ¶¶ 20-23.

were proceeding with six cases and then four cases and that these bills were reasonable. I did not discuss with Dr. Rabbani our bills for March and April 2014.[9]

43. During each of these discussions and during the prior discussions throughout 2013,

44. Submitted herewith as Exhibits 5 through 15 are GT's bills to Enzo, which are unpaid, in whole or in part, for work done during the period September 1, 2013 through April 30, 2014, plus the unpaid bill for work in November 2012 and the two bills (April and May 2013) in which the disbursements were not paid.

45. Attached hereto as Exhibit 16 is a spreadsheet summarizing those bills. The bills reflect the services provided by GT. *See* Mann June Declaration ¶¶ 14 - 32 Exhibit 1 thereto.

46. As appears from Exhibit 16, the totals are now

unbilled disbursements, *see* ¶¶ 47-54

immediately below);

**ADDITIONAL UNPAID DISBURSEMENTS**

47. The last bill sent to Enzo by GT was for the month of April 2014.[10] After April 30th and after the bill for April work was sent to Enzo, GT paid two significant bills on Enzo's behalf which should be added to the unpaid disbursements.

---

[9] Although I did discuss the February bill with him before it was sent because it was the largest bill to date and contained the highest disbursements to date.

[10] GT worked on the Affymetrix case right up to and including the settlement on April 22, 2014. GT negotiated, drafted, and finalized the settlement agreement. GT's motion to withdraw was granted May 9, 2014.

48. The first was paid to Dr. Hope Azarani, an expert retained to submit a report and testify in the Enzo Litigation.

*See* Mann April Decl. ¶¶ 27-34, Burrows April Decl. ¶ 19.

49. Consequently, GT paid her initial bills and advanced her travel and lodging expenses. Those amounts were included in disbursements already billed to Enzo.

50. GT paid those invoices on June 18, 2014. A copy of my letter to Dr. Azarani's representative and copies of the checks are attached hereto as Exhibit 17. The total, should be added to the billed disbursements owed by Enzo. *See* ¶ 46, *supra*.

51. Second, during the months leading up to trial in *PerkinElmer* and *Affymetrix*, in order to avoid conflicts of interest, we discussed with Dr. Rabbani retaining independent counsel to handle third-party discovery (subpoenas, motions to quash, depositions). Dr. Rabbani agreed and suggested a former GT partner with whom he had worked before, Adam Cole, now with the firm of Cousins, Chipman, and Brown LLP. Dr. Rabbani reached a reduced rate agreement with Mr. Cole and Mr. Cole handled the *PerkinElmer* third-party discovery, with some help from GT.

52. Later, in or about February 2014, we asked Mr. Cole do the same in *Affymetrix*.

A copy of my email, dated February 24, 2014, guaranteeing payment to Mr. Cole is annexed hereto as Exhibit 18.

53. Mr. Cole then handled the third-party discovery; his work surely contributed to the eventual settlement that was ultimately reached in *Affymetrix*.

54. Two days ago, GT paid Mr. Cole's bills. A copy of my transmittal letter is annexed hereto as Exhibit 20. The amount of those bills, should also be added to the disbursements owed by Enzo. *See* ¶ 46, *supra*.

55. Accordingly, the total disbursement amount billed, plus unbilled,

56. GT is also entitled to recover its attorneys' fees and costs in connection with both the motion to withdraw and the instant motion to set the value of the charging lien. *See* Ex. 1, General Provisions, ¶ 10.

**AFFYMETRIX AND PERKINELMER SETTLEMENTS**

57. As the Court is aware, the Affymetrix case was settled on or about April 22, 2014. The settlement amount, $5,100,000 was reported by Affymetrix in a Form 8K filed with the SEC on or about May 1, 2014. Enzo reported the settlement in a Form 8K filed April 24, 2014. As reported in Enzo's 8K, 15% of the settlement amount, $765,000, was paid by Affymetrix directly to GT and the balance, $4,335,000, was paid to Enzo. *See* Enzo Form 8K, dated April 22, 2014, annexed hereto as Exhibit 21.

58. As the Court is also aware, the PerkinElmer case was settled on or about June 20, 2014. Doc. No. 283 (03 Civ. 3817). The settlement amount, $7,000,000, was reported by Enzo in a Form 8K on June 23, 2014. Included as exhibits to the 8K were a settlement agreement and an escrow agreement. Parties to the settlement agreement are Enzo and PerkinElmer. Parties to

the escrow agreement are Enzo, PerkinElmer, and Kramer Levin (new counsel for Enzo) as escrow agent. GT is not a party to either agreement, although a release from GT to PerkinElmer is required in order for the escrow to be released. *See* Enzo Form 8K with exhibits, dated June 20, 2014, annexed hereto as Exhibit 22.

59. According to the exhibits, PerkinElmer is to pay directly to Enzo on July 2, 2014 an amount equal to the difference between $7 million (the settlement amount) and the monetary value of GT's charging lien, if the lien amount is less than $7 million and GT seeks it or it is set on or before July 1, 2014. If the monetary amount of the charging lien has not been set or claimed by GT by that date or is $7 million or higher, PerkinElmer is required to pay to the escrow agent the full settlement amount ($7 million). *Id.*

60. GT contends that it is entitled the PerkinElmer settlement amount for three reasons. First, GT did nearly all of the work over 10 years to bring the PerkinElmer case up to the point of trial and up to a settlement posture. Indeed, a trial date was set for March 18, 2014, the day of GT's withdrawal motion. Kramer Levin appeared for Enzo in *PerkinElmer* on May 12, 2014 and apparently finalized the settlement.

61. Second, according to Enzo, a settlement was already "very close" as of April 21, 2014, weeks before GT's motion to withdraw was granted ("PerkinElmer and Enzo were very close to reaching a settlement ... we believe that the PerkinElmer case can be settled in short order."). Tr. at 5.

62. Third, Enzo paid in connection with the Affymetrix settlement and told the Court that it "that it plans to do the same thing with PerkinElmer." Letter from Jeffrey S. Eberhard to the Court, dated April 29, 2014, Doc. No. 259 (03 Civ. 3817) at 2.

**CONCLUSION**

63. In summary, throughout the decade long course of the Enzo Litigation until the departure from GT of Enzo's long-time corporate counsel, Enzo paid every invoice submitted to it by GT as provided in the Engagement Letter. Even after Robert Cohen left GT,

64.

Transcript of March 18, 2014 *in camera* conference, at 13.

65. Precisely because there is no justification for Enzo's failure to pay GT's fees and most of its disbursements during the period from September 2013 through April 2014, GT is entitled to a charging lien amount to be determined by the Court, but at least of the PerkinElmer settlement), sums which Enzo may receive in *Molecular Probes* or *Roche*.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 25, 2014

Michael Burrows