TO BE FILED UNDER SEAL AND REVIEWED *IN CAMERA*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
ENZO BIOCHEM, INC., *et ano.*,           :       03 Civ. 3816 (RJS)
                                         :
           Plaintiffs,                   :
                                         :
     v.                                  :
                                         :
MOLECULAR PROBES, INC.,                  :
                                         :
           Defendant,                    :
---------------------------------------------------------------x
ROCHE DIAGNOSTICS GMBH, *et ano.*,       :       04 Civ. 4046 (RJS)
                                         :
           Plaintiffs,                   :
                                         :
     v.                                  :
                                         :
                                         :
ENZO BIOCHEM, *et ano.*,                 :
                                         :
           Defendants,                   :
---------------------------------------------------------------x
ENZO BIOCHEM, INC., *et ano.*,           :       03 Civ. 3817 (RJS)
                                         :
           Plaintiffs,                   :       **DECLARATION OF DAVID M.**
     v.                                  :       **BRODSKY IN SUPPORT OF**
                                         :       **GREENBERG TAURIG LLP'S MOTION**
PERKINELMER, INC., *et ano.*,            :       **TO DETERMINE THE MONETARY**
                                         :       **VALUE OF ITS CHARGING LIEN**
           Defendants,                   :
---------------------------------------------------------------x

DAVID M. BRODSKY, hereby declares, as follows:

1. I am a member of the Bar of the State of New York and of this Court. I am the sole principal of Brodsky ADR LLC, rendering services as a mediator, arbitrator, and legal consultant.

**I.   The Engagement**

2. In late June 2014, I was retained by Steptoe & Johnson LLP to review certain court filings and records relating to a Charging Lien Motion filed by Greenberg Traurig, LLP

("GT") arising out of its representation of Enzo Biochem in the Enzo Litigation.[1] I was asked to render an opinion, if necessary, regarding (a) whether the terms of compensation in the Engagement Letter are fair and reasonable, (b) whether GT's undiscounted rates applicable to the unpaid invoices at issue in the Charging Lien Motion are consistent with New York practice, (c) whether the form of GT's bills is deceptive or misleading, and (d) whether GT's introduction of commercial litigators to the Enzo Litigation in late 2012, early 2013, was reasonable.

## II. Qualifications

3. Prior to 2012, I was actively engaged as a litigator as (i) an Assistant United States Attorney in the Southern District of New York (1969-1973), and (ii) an associate and partner in three law firms, Guggenheimer & Untermyer (1973-1975, 1976-1980), Schulte Roth & Zabel LLP (1980-1999), and Latham & Watkins LLP (2002-2011). During my career as a litigator, I often participated and, in many cases, led large teams of lawyers, paralegals, contract attorneys, technological staff, and outside contractors, including experts in the prosecution or defense of investigations or litigations, and tried more than fifty trials or arbitrations to final verdict in jury trial, bench trial, or by panels of arbitrators. While at Schulte Roth & Zabel, I was elected as a Fellow of the American College of Trial Lawyers and a Member of the American Law Institute.

4. During my practice at these three firms, I was the billing partner for, literally, hundreds of litigation matters; as such, I prepared invoices to clients myself, after reviewing, revising, where appropriate, and approving monthly, detailed statements of all time incurred by all timekeepers, prepared by members of the legal teams I supervised, and a schedule of all

---

[1] Please note that, in an effort to be efficient, I have used terms in this declaration that I understand have been previously defined in connection with this Charging Lien Motion.

disbursements incurred on each matter. I also reviewed, revised, where appropriate, and approved invoices prepared by other litigation attorneys on matters related to clients for which I bore ultimate responsibility. At one firm, Schulte Roth & Zabel, I was for many years on the Billings and Collections and Executive Committees and, in those capacities, on occasion, reviewed accounts receivable and the invoices related to such receivables that had been prepared by other lawyers in other practice areas in addition to litigation.

5. For thirty months, in 1999-2002, I served as Managing Director and General Counsel-Americas, Credit Suisse First Boston (CSFB), where I was the senior lawyer in the Legal and Compliance Department, with six principal deputies and over 200 legal and compliance professionals reporting, directly or indirectly, to me. I organized and led many long-term projects and legal defenses. Among my responsibilities was the review and revision of billing guidelines for the law firms on CSFB's approved list of firms. I had final approval over all invoices submitted to CSFB for legal services above a certain monetary level. With respect to such invoices, I reviewed them for both substance and compliance with the billing guidelines. Many of these firms were not based in New York and billed for litigation services rendered in federal and state courts around the country. They all adhered to the same billing protocol as the major firms in New York retained by CSFB.

6. I serve or have served in the following organizations and committees:

    a. American Constitution Society for Law and Policy (Chair);

    b. New York City Bar Association (Executive Committee, Vice President, and Chair, Audit Committee);

    c. New York Lawyers for the Public Interest (former Chair);

    d. Equal Justice Works (Chair, Nominating Committee);

e. American Bar Association (Litigation and Dispute Resolution Sections; former Chair of the Trial Practice Committee of the Litigation Section); and

f. New York State Bar Association (Commercial Litigation and Dispute Resolution Sections.

### III. Opinions

7. In rendering my opinions, set forth below, I consulted the documents listed in Appendix A.

8. From my review of these documents, I have formed four principal opinions:

**First,** the Engagement Letter sets forth fair and appropriate terms of compensation for the services rendered in this matter, including provisions requiring Enzo to pay              of GT's service charges, one-hundred percent (100%) of disbursements,               and, in the event that GT withdraws from the representation for "good cause,"              of all fees and expenses billed by GT to Enzo (*see* Burrows Moving Decl., Ex. 1);

**Second,** the underlying undiscounted rates charged by GT to Enzo are consistent with rates charged by firms of comparable quality to GT in the New York legal market for cases of the complexity as the Enzo matters, including those where I was a billing partner and those whose bills I reviewed as General Counsel;

**Third,** GT's billing format for the invoices it issued during the Time Period is neither deceptive nor misleading, and there is nothing inappropriate about GT's use of a single invoice for multiple, related matters in this case; moreover, GT appropriately disclosed its billing rates, did not provide vague time entries, and appropriately used "block billing;"

4

**Fourth**, GT appropriately incorporated commercial litigators into the Enzo Litigation cases in late 2012, early 2013, when the focus of these cases shifted from patent infringement claims to breach of contract claims relating to Enzo's distribution agreements. Moreover, GT provided Enzo an entirely appropriate discount to defray the cost of transitioning the new attorneys into the Enzo Litigation team.

### IV. The Engagement Letter Was Fair and Appropriate

9. I have reviewed the Engagement Letter, which is attached as Exhibit 1 to the Burrows Moving Declaration. Based on my experience, the partial contingency fee arrangement contained in the Engagement Letter, including provisions which specifically obligate Enzo to make certain payments to GT in the event that GT withdraws for "good cause," is fair and appropriate.

10. As a preliminary matter, in my experience, a partial contingent fee agreement that provides a client with a substantial discount off the firm's normal billing rates (here, effectively a              obligates the client to pay 100% of expenses associated with the litigation, and requires the client to pay a contingent fee                wholly appropriate fee structure. Most fundamentally, it takes into account the extent of the financing being provided and risk undertaken by the law firm.

11. The Engagement Letter provision, which anticipates a scenario where GT withdraws from representing Enzo for "good cause," is also entirely fair and appropriate. This language is typically included in engagement letters to protect the law firm from being deprived of the fruits of its work – after it has financed the conduct of the lawsuit over many years. This is particularly true here, where the Engagement Letter defines "good cause" to include "the failure of Enzo to cooperate with its attorneys or comply with this Agreement" (*see* Burrows

5

Moving Decl., Ex. 1 p. 2). One of Enzo's principal obligation under the Engagement Letter was to pay its legal fees on a timely basis.

12. The payment specifically required under the Engagement Letter is also a fair and appropriate percentage. In my opinion, it would not be fair or just simply to pay a firm that is forced to withdraw for "good cause" an amount equal to what it would have been paid at its normal billing rates. This would do nothing to compensate a firm for having given substantial discounts over many years and having forsaken the profits of charging full rates over those years. In my view, a post-withdrawal payment obligation not only makes up for a firm's lost profits but, to a rational client, also serves as a disincentive to disavow the terms of an engagement letter embodying such terms.

13. When considering the dollar value of a payment in this case, it is worth noting two other features of the Engagement Letter. First, the Engagement Letter provides that, under other circumstances, Enzo would have to pay GT up to of all fees and expenses billed. *Id.* It also provides that "Enzo acknowledges that it and GT have not negotiated any fee cap that would apply to this case and that there is no fee cap that applies to this matter." *Id.*

## V. GT's Undiscounted Rates Are Fair And Appropriate

14. In my opinion, the undiscounted hourly rates that GT used on its invoices (and off of which the GT discount was calculated) are fair and appropriate, and are completely consistent with the rates charged by other firms of the quality of GT working on matters as complex as the Enzo litigation.

15. It is worth noting that the rates charged by New York lawyers vary from the rates charged in other parts of the country. I am familiar with this because, over many years, being

commercial matters are billed. Instead, he reflexively refers to billing practices more familiar to insurance defense lawyers, and suggests that they apply to complex commercial litigation, without offering any cited or known authority.

20. Traditionally, insurance companies insist upon a different format than most other corporations insist upon. I am familiar with insurance company billing practices arising from, *inter alia*, my having been designated as Insurance Company Panel Counsel for Director and Officer Liability Policies. The insurance defense format generally requires that lawyers make individual time entries for each task undertaken, and sometimes, attach a code to each such task, even when the task can be as small as making a single five- or six-minute telephone call.

21. By contrast, in my experience, such an individual task-by-task billing format is rarely, if ever, used in complex corporate litigation. In light of the time it takes to review bills in this format, it would be unhelpful for most clients for such individual task-by-task bills to be rendered in complex corporate litigation matters. Indeed, during my tenure as General Counsel, I do not recall that any of the bills I received from more than a score of high quality law firms used billing methods of the type that Brychel appears to claim is standard.

22. I also question Brychel's methodology. It is unclear what GT invoices he reviewed in connection with this preparation of his report. And, since he makes no reference in his report to reviewing any of the pleadings in the Enzo Litigation (much less this motion practice) or to speaking with anyone at Enzo who knows the history of the Enzo Litigation, it is not clear what the basis could be to allow Brychel to have an informed opinion about whatever invoices he actually reviewed.

...

### B. GT's Use Of A Single Bill For Multiple Matters Was Appropriate

23. Brychel takes issue with GT's use of a "single monthly invoice," which he claims "makes it impossible to analyze GT's billing practices on a matter-by-matter basis, and renders each invoice misleading as to the total time billed." Brychel Aff. at 5. Separately, Enzo alleges that the use of a single bill was "deceptive." Opp. Mem. at 5. I disagree.

24. First, in my opinion, the use of a single monthly invoice for a series of related matters is entirely appropriate. It is my understanding that the Enzo Litigation cases, *inter alia*, "had a common core of factual and legal issues," were "consolidated for discovery purposes," and were consolidated for key proceedings, including a Markman hearing and pretrial conferences. Mann Reply Decl. ¶¶ 5-12. Moreover, research, discovery and motion practice in each of the Enzo Litigation cases frequently impacted the parallel aspects of the other Enzo Litigation cases. *Id.* Indeed, my review of the GT invoices at issue in connection with the Charging Lien Motion confirms that many time entries reflect services on these related cases that have application to other Enzo Litigation cases. A series of cases so closely related are appropriately billed in a single invoice.

25. Second, the use of a single monthly invoice is particularly appropriate where the client agrees to this approach. It is my understanding that GT issued a single invoice for the Enzo Litigation cases because Enzo agreed to that approach. Burrows Reply Decl. ¶¶ 32-38. Before Enzo agreed to that approach, GT issued invoices with multiple matters. *Id.*

26. Finally, in my opinion, there is nothing deceptive about the GT invoices. In my view, GT's invoices leaves a reader with no difficulty understanding either what was happening in the litigation month-to-month or what individual attorneys or other timekeepers were doing day-by-day.

9

### C. GT Properly Disclosed Billing Rates

27. Brychel alleges that GT "failed to include timekeeper billing rates" and that this alleged failure "is a highly unusual practice." Brychel Aff. at 6. Brychel's opinion makes little sense to me.

28. First, the GT invoices issued to Enzo for legal services between September 2013 and April 2014 <u>did</u> include GT timekeeper billing rates. Based on my review of the unpaid invoices at issue in this case, only the December 2012 invoice (for November 2012 services) fails to include timekeeper billing rates for that month.

29. Second, it is my understanding that timekeeper billing rates were added to GT's bills at the request of Enzo. Burrows Reply Decl. ¶¶ 39-42. This kind of informal negotiation of the content of invoices is typical as between law firms and their clients.

30. In my opinion, there is nothing inappropriate about the manner in which GT's invoices dealt with the applicable billing rates in this matter.

### D. GT's Invoices Are Not Vague

31. Brychel alleges that "GT invoices included certain extraordinarily vague task descriptions." Brychel Aff. at 8. He singles out Michael Burrows and Ronald Lefton for particular criticism. *Id.* I do not agree with Brychel's opinion.

32. First, I have reviewed the unpaid invoices at issue in the Charging Lien Motion. It is my opinion that these invoices are detailed, clear, and easily understandable by a client with regard to tasks being performed by specific lawyers for the specific matters to which they were assigned, and how much each timekeeper was charging.

33. Second, as to both Mr. Burrows and Mr. Lefton, I have specifically reviewed many, if not all, of their entries appearing on the unpaid invoices. I do not find their entries to be

vague or lacking in specificity. With respect to Mr. Burrows, and contrary to Brychel's assertions, I found that his entries typically did reveal "the individuals with whom Mr. Burrows communicated," and "the subject matter of the emails and conferences" referred to in his entries. *See* Brycell Aff. ¶26. With respect to Mr. Lefton, I found that his entries did not suffer from "pervasive use of vague descriptions," and that his entries typically reflected far more than the snippets referenced by Brychel. *Id.*

### E. GT's Use of "Block Billing" Is Appropriate

34. Brychel alleges that GT engaged in "block billing" and that "the practice of block billing is widely criticized and often prohibited by billing guidelines." Brychel Aff. ¶27. I disagree.

35. First, in my experience, block billing is the form of time entry most commonly used by commercial litigators.

36. Second, if the practice of block billing is generally frowned on by any client base in the legal market, it is insurance companies. Most corporate clients have no issue with block billing because, in my experience, it actually reduces the burden to the client of reading and understanding the scope of services being rendered.

### VI. GT's Transition of Commercial Litigators Into the Enzo Litigation Was Reasonable

37. Brychel alleges that the introduction of commercial litigators into the Enzo Litigation in late 2012, early 2013, "raises questions about staffing efficiency." Brychel Aff. ¶24. Enzo criticizes what it refers to as GT's "revolving door of lawyers." Opp. Mem. at 3. In my opinion, GT's introduction of commercial litigators to the Enzo Litigation in late 2012, early 2013, was entirely reasonable and appropriate.

11

38. First, it is my understanding that, in 2012, the center of gravity of the Enzo Litigation cases shifted from patent infringement claims to breach of contract claims. Mann Reply Decl. ¶¶ 13-14. In my experience, talented patent infringement and commercial litigators have different skills set. In an effort to maximize the potential outcome for a client, it makes very good sense to incorporate new lawyers where there has been a fundamental shift in the case from a specialized practice, like patent infringement work, to more general commercial litigation.

39. In my experience, I have seen cases experience fundamental shifts in focus like that which I understand occurred in the Enzo Litigation. For example, in a litigation arising out of a finance dispute, it became necessary to bring in a sophisticated finance transactional lawyer. In another case, a bankruptcy matter, when the matter was scheduled for discovery and a trial, I was added to the team for purposes of conducting the trial. In other words, changing circumstances demand changes in staffing.

40. Second, it is my understanding that Michael Burrows and Jeff Mann, the lawyers who, starting in late 2012, lead the GT team working on the Enzo Litigation, worked diligently to ensure that the new team played leadership roles in the cases as they progressed and made every effort to ensure that the new team worked as efficiently as possible. Mann Reply Decl. ¶¶ 15-24.

## VII. GT's Fee Concessions To Defray The Transition Costs Were Reasonable

41. Brychel suggests that Enzo paid for the time GT's commercial litigators spent "learning, orienting or getting up to speed on the matters." Brychel Aff. ¶ 25. Brychel concludes "to be clear, this was for timekeepers to study and learn cases that had been ongoing, and which had been staffed by numerous other billers for the preceding 8.5 years." *Id.* Brychel has his facts wrong, and the discount that GT extended to Enzo to defray the transition costs was entirely reasonable.

42. First, it is my understanding that GT gave Enzo a discount on its already discounted fees to defray the cost of the transition. Burrows Reply Decl. ¶¶ 43-53. GT agreed with Enzo that GT would increase the discount set forth in the Engagement Letter so that, instead of paying ⬛⬛⬛ fees, Enzo would ⬛⬛⬛. Altogether, this discount was applied to GT's bills between April and July 2013, and generated a saving for Enzo of ⬛⬛⬛. *Id.* Clearly, the transition cost Enzo nothing.

43. Second, the fee concessions made by GT to defray the cost to Enzo of this transition in staffing, was entirely fair and appropriate. In my experience, prominent law firms, including those in which I have been a partner and those who rendered services to CSFB when I was General Counsel, have developed standards of how to deal with the extra costs incurred by bringing on such new teams. In my experience, almost always these standards involve the firms offering significant discounts from their standard billing charges to their clients during the periods the firms were incurring such learning curve costs. I did so myself on many occasions. The discount extended by GT to Enzo was entirely consistent with this widely accepted approach to managing litigation.

13

I declare under penalties of perjury that the foregoing is true and correct.

Dated: New York, New York
July 28, 2014

                                                    */s/ David M. Brodsky*
                                                    David M. Brodsky

## Appendix A

1. Greenberg Traurig, LLP ("GT") Motion to Withdraw as Counsel ("Motion to Withdraw")
    a) Declaration of Michael Burrows in Support of GT's Motion to Withdraw, and attached exhibits; and
    b) GT Memorandum of Law in support of Motion to Withdraw.

2. Enzo Opposition to Motion to Withdraw
    a) Declaration of Elazar Rabbani in Opposition to Motion to Withdraw.

3. GT Reply to Opposition to Motion to Withdraw
    a) Declaration of Michael Burrows, and attached exhibits; and
    b) Declaration of Jeffrey R. Mann, and attached exhibits.

4. Motion to Withdraw Hearing
    a) Transcript of Hearing on Motion to Withdraw.

5. GT Motion to Determine the Monetary Value of its Charging Lien, and attached exhibits ("Charging Lien Motion").
    a) GT Memorandum of Law In Support of its Charging Lien Motion; and
    b) Declaration of Michael Burrows in Support of Charging Lien Motion, and attached exhibits; and
    c) Declaration of Jeffrey Mann in Support of Charging Lien Motion, and attached exhibits.

6. Enzo Response to Charging Lien Motion
    a) Enzo Memorandum of Law in Response to Charging Lien Motion;
    b) Affidavit of Michael J. Brychel, and attached exhibits; and
    c) Affidavit of Barry W. Weiner, and attached exhibits.

7. GT's Reply to Enzo Response to Charging Lien Motion
    a) Reply Declaration of Michael Burrows in Support of Charging Lien Motion, and attached exhibits; and
    b) Reply Declaration of Jeffrey Mann in Support of Charging Lien Motion, and attached exhibits.