TO BE FILED UNDER SEAL AND REVIEWED *IN CAMERA*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
ENZO BIOCHEM, INC., et ano.,                :   03 Civ. 3816 (RJS)
                                            :
                    Plaintiffs,             :
        v.                                  :
                                            :
MOLECULAR PROBES, INC.,                     :
                                            :
                    Defendant,              :
---------------------------------------------------------------X
ROCHE DIAGNOSTICS GMBH, et ano.,            :   04 Civ. 4046 (RJS)
                                            :
                    Plaintiffs,             :
        v.                                  :
                                            :
ENZO BIOCHEM, et ano.,                      :
                    Defendants,             :
---------------------------------------------------------------X
ENZO BIOCHEM, INC., et ano.,                :   03 Civ. 3817 (RJS)
                                            :
                    Plaintiffs,             :
        v.                                  :   **REPLY DECLARATION OF JEFFREY R.**
                                            :   **MANN IN SUPPORT OF GREENBERG**
PERKINELMER, INC., et ano.,                 :   **TRAURIG, LLP'S MOTION TO DETERMINE**
                                            :   **THE MONETARY VALUE OF ITS**
                    Defendants,             :   **CHARGING LIEN**
---------------------------------------------------------------X

JEFFREY R. MANN, hereby declares, as follows:

1. I am a member of the Bar of the State of New York and of this Court. I am a shareholder in the New York office of Greenberg Traurig LLP ("GT"), formerly attorneys for Enzo Biochem, Inc. and Enzo Life Sciences, Inc. (collectively, "Enzo") in the above captioned cases and in the five related actions previously before this Court (collectively, the "Enzo Litigation").

2.  I submit this Reply Declaration in further support of GT's Charging Lien Motion and in opposition to Enzo's response to the Charging Lien Motion ("Enzo Response").[1]

3.  The Enzo Response consists almost entirely of unsupported arguments of Enzo's latest new counsel founded on erroneous statements of fact and law and seemingly prepared without consultation with the one person at Enzo who actually knows the facts, Dr. Elazar Rabbani.

4.  Through this declaration I intend to:

   a.  Describe how the various Enzo matters shared common factual and legal issues;

   b.  Describe how GT staffed the Enzo matters beginning in December 2012 after the Court dismissed many of the patent claims pending in the Enzo Litigation; and

   c.  Respond to Enzo's baseless assertions that GT                              by allegedly failing to (a) amend the various complaints in the Enzo Litigation to expressly include non-patent claims that were then dismissed by this Court in the Fall of 2013; and (b) take the deposition of a former PerkinElmer sales executive, Jill Winer.

A.  **The Enzo Litigation Cases Share Common Legal And Factual Issues**

5.  Enzo was the owner or exclusive licensee of seminal patents relating to genetic testing. It entered into distribution agreements with, among others, Roche Diagnostics, Amersham, Affymetrix and PerkinElmer to manufacture, sell and distribute various products covered by the Enzo patents. Under its distribution agreement, PerkinElmer appointed Amersham, MPI and Orchid (and many others) as sub-distributors.

---

[1] The Enzo Response consists of Enzo's Memorandum of Law in Opposition ("Opp. Mem."), Affidavit of Barry W. Weiner ("Weiner Aff."), and Affidavit of Michael J. Brychel ("Brychel Aff.").

6.  The contractual arrangements made by Enzo with these parties limited the parties' use or sale of the products to "research use only," excluding use for commercial non-research uses, including new product development such as pharmaceuticals, diagnostic testing and the like.

7.  Accordingly, each of the Enzo Litigation matters had a common core of factual and legal issues including, for example, the nature of the products that were made or sold by each of Enzo's counterparties, the uses the purchasers or end-users of the products made of the products, and the labeling or other attribution of the products as prescribed by the agreements between Enzo and its counterparties.

8.  Early in the Enzo Litigation, Judge Sprizzo, directed that the cases be consolidated for discovery purposes and bifurcated the Enzo Litigation cases for liability and damages discovery. All of these cases were governed by two largely identical confidentiality or protective orders. As a result, discovery was commonly conducted with documents, interrogatories and depositions shared among all parties to the Enzo Litigation and all parties being provided with notice of all pretrial proceedings.

9.  In the later years, many of the Enzo Litigation proceedings were conducted on a consolidated basis. For example, a single Markman hearing on claims construction of the patents was conducted by Judge Sprizzo. Motions for summary judgment on patent issues, though separately made, were made at the same time, with some joint papers being filed. Subsequently, after consolidated pretrial conferences, motions for summary judgment on the non-patent issues were also made on the same briefing schedule with many issues in each of the cases being common to all of the cases.

10. The Court may recall, for example, in the PerkinElmer case, that I argued at summary judgment that the meanings of the terms "research use only" by a "research end-user" and not for use in "commercial development" was importantly influenced by the deposition testimony of a witness in another of the Enzo Litigation cases. Specifically, I relied on the testimony of Victoria Singer, an MPI employee, who testified that pharmaceutical companies are only engaged in the development of new products and, thus, research conducted by pharmaceutical companies was for product development.

11. Similarly, evidence developed in the MPI, Orchid and Amersham cases was relevant to the damages analysis in the PerkinElmer case. See ¶¶ 25-39, *infra*.

12. As a result of the numerous common issues presented across the Enzo Litigation and the consolidation of these cases for discovery purposes, the work performed by GT, as well as by its predecessor counsel, in any one of the cases, was potentially useful in each of the other cases. This was true of the work in discovery of the facts and well as in the analysis of the applicable law.

### B. GT Properly Staffed The Enzo Litigation Cases With Commercial Litigators After the Court Dismissed The Patent Claims

13. The Enzo Litigation was initially focused on Enzo's patent infringement claims. This changed significantly in September 2012, when this Court granted summary judgment against Enzo and dismissed many of Enzo's patent claims other than for indirectly detectable products. This decision thrust the secondary common law claims to center stage, but with distinct disadvantages for Enzo. These included ambiguities in the subject contracts and the absence of contracts with MPI and Orchid. Defendants then sought to revive their motions for summary judgment on the common law claims.

14. In December 2012, GT's commercial litigation group took responsibility for Enzo's opposition to the non-patent summary judgment motions that were filed by each of the remaining six parties in the Enzo Litigation. The plan, agreed upon by Enzo, was that at trial the commercial litigators would handle the remaining non-patent issues in collaboration with GT's patent lawyers.

15. To manage the substantial task of responding to each of the six separate motions, under the general supervision of Michael Burrows and me, three teams of lawyers were initially established, each team consisting of one litigation shareholder (partner) and two litigation associates. The six cases were divided as follows:

> Team 1 – PerkinElmer and Amersham – Shareholder: Jeffrey Mann; Associates: Justin MacLean (PerkinElmer) and John Elliott (Amersham).
>
> Team 2 – Roche and Affymetrix – Shareholder: Victor Polk; Associates: Jennifer Moore (Roche) and Rachel Sims (Affymetrix)
>
> Team 3 – Molecular Probes and Orchid Biosciences – Shareholder: Ronald Lefton; Associates: Roy Taub (MPI) and Lauren Grassotti (Orchid).

16. These cases proceeded through stages which required GT attorneys to draft Enzo's responses to the defendants' summary judgment motions on the non-patent claims, conduct discovery, argue the defendants' summary judgment motions, conduct damages discovery, and prepare for trial. The services performed by the GT lawyers during these stages were defined and sequenced by the scope of a series of scheduling orders issued by the Court. These scheduling orders are attached here to as Exhibits 1-6.

17. As the needs of these cases evolved, so did the staffing. For example, when GT largely defeated the defendants' non-patent motions for summary judgment in the PerkinElmer, Affymetrix and Roche cases, it became apparent that we would need to refocus our teams on damages discovery and trial preparation in these matters. During the early months of 2014, the

trial dates for the PerkinElmer and Affymetrix cases were changed, requiring adjustments in the timing and staffing of these cases.

18. The staffing needs were most evident with respect to the cases scheduled to proceed to trial first – the PerkinElmer and Affymetrix matters. Ronald Lefton was designated to second chair the PerkinElmer trial, while Lauren Grassotti and Mr. Lefton managed pre-trial work on the Affymetrix case. Karen Bitar, a shareholder and an experienced trial lawyer, was added to second chair the Affymetrix trial and to play a key role in pre-trial work on both the Affymetrix and PerkinElmer cases. Key additional associate support on the Affymetrix and PerkinElmer matters came from Alena Benowich and Ben Schiffman.

19. More broadly, I worked hard to ensure that the provision of services was efficient. I asked the lawyers who had close familiarity with the summary judgment motions to work on damages and expert discovery and I asked the support staff members who had worked on the summary judgment motions to prepare witness files for damages discovery and trial. A few additional relatively junior attorneys were charged with responsibility for discrete legal research on evidentiary issues expected to be the subject of *in limine* motions. I assigned attorneys to handle research and writing in connection with expert reports and the anticipated Daubert motions. We made every effort to coordinate the work of all of the other team members in order to assure efficiency.

20. Proceeding on a slower track were the Roche and MPI cases. Richard Pettus and Jonathan Ball, shareholders in the Intellectual Property Litigation Group, coordinated work on the patent aspects of the Roche and MPI cases. Michael Burrows and I coordinated work on the non-patent aspects of the Roche case.

21.     GT also made use of contract lawyers on an "as needed" basis. Their responsibilities were limited to targeted review of documents contained in the universe of more than one million documents produced by the parties to the Enzo Litigation. The contract lawyers worked on the premises of GT, and GT billed Enzo for their services at cost without charging Enzo anything for the overhead GT provided to the contract lawyers. The teams were also supported by legal assistants and technical litigation support specialists.

22.     In order to maximize efficiencies across all of the teams and to insure that information in each case was available for use in the other cases, I regularly communicated, through conferences, telephone conversations and email with all of the team members.

23.     A relatively small group of timekeepers billed more than 500 hours of work on the Enzo Litigation during the eighteen months from November 2012 and April 2014, including only four partners (Michael Burrows, Ron Lefton, Richard Pettus and me), seven associates, and four paralegals. In sharp contrast, during this same period of time, fifty-two timekeepers performed occasional tasks on the Enzo Litigation cases and each billed less than 50 hours on these matters.

24.     In my experience in managing and participating in large cases (here, six cases), the number of time keepers involved in the Enzo Litigation between November 2012 and April 2014, and the concentration of work in a relatively small group of time keepers, was entirely appropriate and well within the range of what would be expected from New York counsel.

C.    **Pleading And Summary Judgment**

25.     In opposition to the Charging Lien Motion, Enzo argues that GT was

This argument has no merit. In fact, the record makes clear that GT was diligent in its representation of Enzo in connection with the defendants' motions for summary judgment.

26. Fundamentally, Enzo's argument ignores the history of the Enzo Litigation, and, in particular, the status and dynamics of the Enzo Litigation at the time the parties briefed and argued the summary judgment motions.

27. As originally drafted, the complaints in the Enzo Litigation emphasized the defendants' histories of patent infringement, and included subordinate causes of action sounding in common law. On September 24, 2012, this Court granted, in part, the defendants' motions for summary judgment and dismissed many of Enzo's patent claims. The Court relied heavily on Judge Sprizzo's *Markman* decision, and found that Enzo's patents only covered indirectly detectable products. These decisions significantly limited Enzo's ability to pursue a recovery based on its patent infringement claims and elevated the importance of Enzo's non-patent claims, most notably, its claims that the defendants breached the terms of their distribution agreements.

28. Thereafter, the defendants filed motions for summary judgment seeking to dismiss the non-patent claims. GT attempted in its responses to defeat the defendants' motions for summary judgment on the non-patent and common law claims and, to the extent possible, to claw back what it could as to the dismissed patent claims. There was nothing about GT's efforts on behalf of Enzo.

29. Enzo's arguments about the quality of GT's lawyering on the Enzo Litigation cases also ignore two indisputable facts: (a) GT defeated defendants' summary judgment motions in Affymetrix, PerkinElmer and Roche, which were the three principal cases in terms of remaining prospective recoveries; and (b) a very substantial portion of the fees which Enzo has

not paid (and which necessitated this Charging Lien Motion) reflect preparation of the PerkinElmer and Affymetrix cases for trial, including damages discovery, retention of experts and expert discovery, preparation of the pretrial orders, motions *in limine*, Daubert motions, and trial preparation.

30. Enzo's principal criticism of GT is based on the Court's comments regarding what the Court deemed to be belated attempts by GT to plead new claims for relief. Opp. Mem. at 11-16. Again, this argument misstates the record.

31.

This argument was advanced in opposition to summary judgment as an alternative breach of contract theory in connection with the development and sale by Affymetrix of its RLR/DLR product. Despite the Court's rejection of this theory, the underlying contract claim against Affymetrix pertaining to the development and sale of RLR/DLR survived on summary judgment. Damages for the improper development of those products were calculated and GT was preparing for trial when the case settled.

32. With regard to PerkinElmer, Enzo bases its criticism of GT on the fact that the Court dismissed GT's claims that PerkinElmer (a) sold Acyclos instead of Enzo Products; (b) continued to manufacture Enzo products after Enzo revoked this license; (c) failed to pay a transfer fee based upon the actual sales price of products that PerkinElmer custom manufactured; and (d) failed to pay transfer fees after January 1, 2004 through August 28, 2005. *Id.* at 14-15.

33.

34.

35.

36.     Fourth, we respectfully disagree with the Court's ruling on the duration of the contract. We believe that issue was implicitly a question for the jury in determining the contract obligations and the scope of damages.

37.

38.

In each case, the essential claim survived against PerkinElmer and constituted a considerable portion of the damages against PerkinElmer. The conduct of PerkinElmer's sub-distributors was the responsibility of PerkinElmer and it was fully able to satisfy any judgment that might have been awarded to Enzo on these claims. Thus, there was no injury to Enzo except to satisfy its preference to sue three parties instead of just the one with whom it had a contract. Thus, Amersham's failure to label its cyanine products that it bought from PerkinElmer would help establish PerkinElmer's liability.

39.     The separate claim against Amersham ultimately depended on the patent claim which this Court rejected on the merits of the claim construction. To the extent the labeling issue extended to Amersham products it purchased directly from Enzo, we again respectfully disagree with the Court's holding. We believe that claim falls within the allegations of breach in paragraph 58 of the complaint against Amersham.

40.     During summary judgment proceedings and thereafter, Enzo's CEO, Dr. Rabbani, was directly involved.

A perfectly reasonable decision, but he and Enzo cannot have it both ways. An adverse decision does not mean negligence by counsel. Nor does an adverse decision justify Enzo's refusal to honor its own contractual obligation to pay legal fees at the agreed upon           subject to a           the balance.

### D.     The Deposition Of Jill Winer

41.     Enzo complains that GT did not depose Jill Winer in the PerkinElmer case. Opp. Mem. at 8-9. Notably, Enzo does not offer a single fact witness to explain why Winer should have been deposed. Enzo simply attaches the PowerPoint to the affidavit of Barry Weiner, and leaves it to counsel to speculate about its meaning. No weight should be given to this document.

42.     To the extent the Court considers the Winer PowerPoint, it is notable that Winer is a former employee of PerkinElmer, located in California, whom we understood to be hostile to Enzo. There would be little utility in giving a hostile witness a platform for negative testimony. Instead we had the power point presentation that would have been admitted as a business record

and, to the extent it had any evidentiary value, it spoke for itself.[2]  There was no reason to risk diluting the effect of that evidence.  Moreover, the underlying claim of diverting sales from an Enzo Product was preserved in the claim under the implied covenant of good faith and fair dealing.  GT did serve a subpoena on Ambion with regard to its alleged sales along with PerkinElmer manufactured products of a competing kit.  These sales were also part of the expert's damage analysis and contributed approximately $120,000 in damages based on sales of 929 kits.

43.     This criticism by Enzo exemplifies its failure to appreciate the big picture.  It wanted to engage in grand litigation against multiple parties, but it now refuses to pay for doing so.  Hindsight analysis of minor items does not establish negligence or other malpractice.

E.     **The PerkinElmer Case Was Ready For Trial**

44.     Enzo complains that the PerkinElmer case was not trial ready as a further argument that GT's fees should not be paid. (Opp. Mem. at 2)  Enzo is wrong.  The Court adjourned the trial of the PerkinElmer case because the parties could not reach agreement on a variety of issues that, for pre-trial order purposes, needed to be resolved.  *See also* Burrows Reply Decl. ¶¶ 88-93.

45.     In support of its view, Enzo selectively quotes the Court, but leaves out the heart of the Court's reason for adjourning the trial.

> "The Court:  Good morning.
> What the heck is going on here, guys?  I have to tell you, we were scheduled for a trial a long time ago, and I thought we were going to do that.  Then I got literally a mountain of stuff where there's eight motions in limine from PerkinElmer and four from Enzo, all of which or some of

---

[2] Enzo's suggestion that it found the Winer PowerPoint presentation and GT did not is simply wrong.  PerkinElmer produced a version of this PowerPoint presentation in discovery several years ago (PE105637-PE105645).  It was not viewed as a critical document then (or now).  Although it was on our exhibit list along with approximately 1,000 other exhibits.

> which at least are really akin to new motions for summary judgment. I then have Daubert motions for three witnesses that one side is seeking to preclude or exclude, and then another expert who is [sic] the other side is seeking to exclude. Then I have literally hundreds of exhibits to which there are objections and as well as hundreds of deposition designations over which there are objections.
>
> I have a pretrial order in which PerkinElmer announces that we don't really even need to have a trial, which I thought that's why we have summary judgment motions.

Hearing Transcript (corrected), March 18, 2014, page 3, lines 3-18.

46. The PerkinElmer case had been strenuously litigated for more than ten years. The pretrial record was extensive. The issues for trial were hotly and closely contested and counsel could not come to agreement about trial exhibits, deposition designations, jury instructions and the like. In addition, issues pertaining to the joint pretrial order were not resolved. However, on Enzo's side, an order of proof for the trial had been prepared, witnesses had been readied, witness files for cross-examination had been created and cross-examination of expected PerkinElmer witnesses and an opening statement had been outlined. We were prepared to begin the trial.

47. Similarly, the pretrial order in Affymetrix was on the cusp of completion. It was due the same day as the case was settled, as were motions *in limine* and Daubert motions, all of which had been drafted. Damages and expert discovery had been completed and witnesses had been interviewed. At the same time we awaited decision from the Court on a previously filed motion to reconsider.

48. As the PerkinElmer and Affymetrix cases were readied for trial, the Roche and MPI cases were being advanced towards that end.

49.     In short, notwithstanding Enzo's decision not to pay months of GT bills, GT lawyers moved all of these cases towards their proper conclusion.

Dated:  New York, New York
        July 28, 2014

_____
Jeffrey R. Mann

NY 244223460v1